**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Wilmer LOMAYAOMA, Defendant–Appellant.**

**Nos. 95–10516, CR–90–00313–EHC.**

United States Court of Appeals, Ninth Circuit.

Submitted May 17, 1996.*

Decided May 29, 1996.

---

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a); Ninth Circuit Rule 34–4.

Before PREGERSON and TROTT, Circuit Judges, and EZRA, District Judge.**

PREGERSON, Circuit Judge:

Wilmer Lomayaoma was convicted of criminal sexual contact under the Indian Major Crimes Act, 18 U.S.C. § 1153, and 18 U.S.C. § 2244(a)(1). While on supervised release, Lomayaoma was implicated in a child molestation incident. The district court held a hearing and then decided to revoke Lomayaoma's supervised release. We determine that the district court had jurisdiction under the Indian Major Crimes Act, 18 U.S.C. § 1153.[1] We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I

In September 1990, Lomayaoma was indicted in the United States District Court for the District of Arizona for violations of 18 U.S.C. §§ 1153 & 2244(a)(1). The indictment charged Lomayaoma with one count of abusive sexual contact with a minor female child under the age of twelve. The indictment alleged that this criminal sexual contact took place on the Hopi Indian Reservation. Lomayaoma pled guilty to the indictment in November 1990.

In February 1991, the district court sentenced Lomayaoma to a fine, twenty-one months of imprisonment, and thirty-six months of supervised release. The court conditioned the supervised release on Lomayaoma's remaining "law abiding." The issues on appeal relate to Lomayaoma's conduct during his supervised release.

In July 1995, Lomayaoma's probation officer, James Barquin, petitioned the court for

Charles F. Hyder, Assistant United States Attorney, Phoenix, Arizona, for plaintiff-appellee.

Jon M. Sands, Assistant Federal Public Defender, Phoenix, Arizona, for defendant-appellant.

** The Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation.

1. Section 1153, entitled "Offenses committed within Indian country," reads:

(a) *Any Indian who commits against the person or property of another Indian or other person any of the following offenses,* namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury ..., an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title *within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States*

(b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which *such offense was committed* as are in force at the time of such offense. 18 U.S.C.A. § 1153 (West Supp.1996) (emphasis added).

revocation of Lomayaoma's supervised release. The petition alleged that Lomayaoma had committed two counts of child molestation on August 2, 1994, in violation of the condition of his supervised release. Lomayaoma opposed the petition.

On October 13, 1995, the district court conducted an evidentiary hearing. The court heard the testimony of the alleged victims, Mary and Jane Doe,[2] as well as testimony from Angelina Talyumptewa, a Counselor for the Hopi Children's Court. The testimony established that on the morning of August 2, 1994, Lomayaoma, without permission, entered the victims' home, which is located in Polacca, Arizona on the Hopi Indian Reservation. Mary and Jane were the only persons at the home on the morning of August 2, 1995. Mary was fourteen years old and Jane was twelve at the time of the incident.

The events as alleged by the two girls are as follows. Lomayaoma entered Jane's bedroom and woke her by touching her on her breast or stomach area.[3] Jane did not yell or scream and the defendant left the room. Lomayaoma then entered Mary's bedroom. He woke her by placing his hand on her vagina.[4] Mary testified that the touching occurred through the blankets and her clothes, but was forceful enough for her to feel its pressure, giving her a "tingly feeling." Mary also testified that Lomayaoma's touching made her feel "dirty" and "awful."

Lomayaoma then fled the house. Shortly thereafter, Jane telephoned her mother, who immediately notified the Hopi Tribal Police. The police went to the victims' home with Talyumptewa, the Hopi Children's Court Counselor, to investigate the incident. Talyumptewa testified that the ordeal had ad-versely affected the girls, making psychological counseling necessary.

The court found that the testimony of the two sisters was credible and that the nature of the acts would constitute illegal sexual contact under 18 U.S.C. § 2246.[5] The court then concluded that the government had proved that Lomayaoma had failed to remain law abiding.

At a final hearing held on November 6, 1995, Lomayaoma moved to dismiss for want of jurisdiction. The court denied the motion. In an order filed November 7, 1995, the district court sentenced Lomayaoma to ten months imprisonment for violation of the terms of his supervised release. Lomayaoma now appeals.

## II

Before we reach the merits, we address Lomayaoma's argument that the Supreme Court's decision in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), requires us to find that the Indian Major Crimes Act, 18 U.S.C. § 1153, is unconstitutional. In addressing this argument, we look first to *Lopez* and then to the Court's recent decision in *Seminole Tribe of Florida v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). We then consider the Indian Major Crimes Act.

### A

*Lopez* addressed a conviction under the Gun–Free School Zones Act, 18 U.S.C. § 22(q)(1)(A) (1988 ed. Supp. V). *Lopez*, —— U.S. at ——, 115 S.Ct. at 1626. In the Gun–Free School Zones Act, Congress criminal-

---

**2.** The victims are minors and the record is sealed. We therefore refer to the victims as "Mary and Jane Doe."

**3.** The witness's testimony was unclear as to whether the touching was on her breast or stomach area.

**4.** Mary testified:

> Q. Okay. What caused you to wake up?
> A. I felt a hand on my vagina when I woke up.
> Q. Where did you feel a hand?
> A. On my vagina.

Q. And when you woke up, what did you see?
A. I saw Wilmer standing by my bed.
Q. Now, when you awakened, was there anybody else in the bedroom other than you and Wilmer?
A. No.

Transcript of Proceedings, Oct. 13, 1995, at 8.

**5.** 18 U.S.C. § 2246 provides:

Sexual contact means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

ized possession of a firearm within defined school zones. Alfonso Lopez, Jr., a 12th-grade student, was convicted under the Act after he arrived at his high school carrying a handgun and five bullets. *Id.* In overturning Lopez's conviction, the Fifth Circuit held that the Gun–Free School Zones Act was "invalid as beyond the power of Congress under the Commerce Clause." *Id.* (quoting 2 F.3d 1342, 1367–68 (5th Cir.1993)).

The Supreme Court affirmed. The Court began its analysis with what it termed "first principles." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1626. Among these constitutional precepts, the Court explained, is the principle that Congress's power to legislate under the authority of the Interstate Commerce Clause is necessarily limited. *Id.* at —— –——, 115 S.Ct. at 1626–27. Thus, Congress may regulate only those activities that "substantially affect[ ]" interstate commerce. *Id.* at ——, 115 S.Ct. at 1630. The Court stated, "by its terms the [Gun–Free School Zones] Act has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez,* at —— – ——, 115 S.Ct. at 1630–31; *see* Charles Fried, *The Supreme Court, 1994 Term—Foreword: Revolutions?,* 109 Harv. L.Rev. 13, 41 (1994). The fact that education is an area "where States historically have been sovereign" increased the Court's concern that Congress was exceeding its Interstate Commerce Clause power by regulating guns in local school zones. *Lopez,* at —— –——, 115 S.Ct. at 1632–33; Fried, 109 Harv. L.Rev. at 41.

In *Seminole Tribe,* the Supreme Court struck 25 U.S.C. § 2710(d)(7), in which Congress purported to authorize tribes to sue states in federal court to enforce the Indian Gaming Regulatory Act of 1988. The Seminole Tribe used this provision to sue Florida. Florida argued that the suit violated its Eleventh Amendment immunity from suit in federal court. The Supreme Court agreed, holding that Congress could not use the Indian Commerce Clause to abrogate Florida's Eleventh Amendment immunity. *Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1122. However, the Court then took care to reaffirm the principle that Indian commerce is

under the exclusive control of the Federal government. *Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1126. Indeed, the Court recognized that although they are similar, the Indian Commerce Clause confers more extensive power on Congress than does the Interstate Commerce Clause. *Id.*

Reading *Lopez* with *Seminole Tribe,* we do not believe that the Court has called into question Congress's authority under the Indian Commerce Clause to regulate Indian criminal conduct in Indian country.

**B**

■ Historically, Congress has held plenary authority to regulate Indian affairs. This power "to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself. Article I, § 8, cl. 3, provides Congress with the power to 'regulate Commerce ... with the Indian Tribes,' and thus, to this extent, singles Indians out as a proper subject for separate legislation." *Morton v. Mancari,* 417 U.S. 535, 551–52, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). *See also* William C. Canby, Jr., *American Indian Law* 2, 11–12 (2d ed.1988) (discussing federal power over Indian affairs). We therefore note at the outset that "first principles" in federal Indian law are distinct from those governing the federal regulation of interstate commerce. *See* Philip Frickey, *Marshalling Past and Present: Colonialism, Constitutionalism, and Interpretation in Federal Indian Law,* 107 Harv. L.Rev. 381, 384 (1993).

In the Indian Major Crimes Act of 1885, Congress chose to "place[ ] under the jurisdiction of the federal courts Indian offenders who commit certain specified major offenses." *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 203, 98 S.Ct. 1011, 1018, 55 L.Ed.2d 209 (1978) (citing Act of Mar. 3, 1885, § 9, 23 Stat. 385, now codified, as amended, 18 U.S.C. § 1153). In 1886, the Supreme Court upheld the Indian Major Crimes Act as within the power of Congress to regulate Indian criminal activity in Indian country. *United States v. Kagama,* 118 U.S. 375, 384–85, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886). The Court's decision in *Kagama* was

not anomalous. *See, e.g., United States v. Antelope,* 430 U.S. 641, 648, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (1977), *Keeble v. United States,* 412 U.S. 205, 209, 93 S.Ct. 1993, 1996, 36 L.Ed.2d 844 (1973); *Lone Wolf v. Hitchcock,* 187 U.S. 553, 566–67, 23 S.Ct. 216, 221–22, 47 L.Ed. 299 (1903); *United States v. Thomas,* 151 U.S. 577, 585, 14 S.Ct. 426, 429, 38 L.Ed. 276 (1894). Even in more recent years, the Court has assumed the constitutionality of the Indian Major Crimes Act. *See, e.g., Negonsott v. Samuels,* 507 U.S. 99, 103, 113 S.Ct. 1119, 1122, 122 L.Ed.2d 457 (1993); *Oliphant,* 435 U.S. at 203–04 & n. 14, 98 S.Ct. at 1018–19 & n. 14. For example, in *Negonsott* the Court stated: "[a]s the text of § 1153 ... and our prior cases make clear, federal jurisdiction over the offenses covered by the Indian Major Crimes Act is 'exclusive' of state jurisdiction." *Negonsott,* 507 U.S. at 103, 113 S.Ct. at 1122 (citations omitted).

■ Neither *Lopez* nor *Seminole Tribe* should be read as casting doubt on Congress's power to enact the Indian Major Crimes Act.[6] *See Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1126; Fried, 109 Harv. L.Rev. at 34–44 (*Lopez*). *Lopez* overturned an act of Congress that impinged on state sovereignty, —— U.S. at —— – ——, 115 S.Ct. at 1626–27, 32–33, and *Seminole Tribe* overturned a congressional statute that abrogated the States' Eleventh Amendment sovereign immunity, —— U.S. at ——, 116 S.Ct. at 1122. The Indian Major Crimes Act, by contrast, governs an area where Congress has traditionally held plenary and exclusive power. We therefore conclude that Congress did not exceed its powers under the Indian Commerce Clause when it enacted the Indian Major Crimes Act in 1885.

■ We have explained that one of the purposes of § 1153 is to "grant[ ] exclusive jurisdiction to federal courts for federal or state crimes committed by Indians in Indian country." *United States v. Bear,* 932 F.2d 1279, 1281 (9th Cir.1990). See *Negonsott,* 507 U.S. at 103, 113 S.Ct. at 1122. Here, Lomayaoma is a Hopi Indian and his criminal activities occurred on the Hopi Indian Reservation. This case undoubtedly falls squarely within the federal courts' jurisdiction as defined by Congress in § 1153(a). *See Bear,* 932 F.2d at 1280.

We turn to the merits.

### III

■ We review a district court's application of the supervised release statute de novo. *United States v. Lockard,* 910 F.2d 542 (9th Cir.1990). We review a district court's factual findings at the sentencing phase for clear error. *United States v. Haggard,* 41 F.3d 1320, 1329 (9th Cir.1994). We have explained that "[a] district court may 'revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release ... if the court ... finds by a preponderance of the evidence that the defendant violated a condition of supervised release.'" *United States v. Vallejo,* 69 F.3d 992, 994 (9th Cir.1995) (quoting 18 U.S.C. § 3583(e)(3)), *cert. denied,* —— U.S. ——, 116 S.Ct. 1447, 134 L.Ed.2d 567 (1996).

■ A condition of Lomayaoma's supervised release was that he remain law abiding. Thus, in this case, a conviction is not a prerequisite for revoking supervised release. As the supervised release statute makes clear, the court in this case only needed to look to the testimony presented to determine whether a "preponderance of the evidence" supported the conclusion that Lomayaoma had acted unlawfully. 18 U.S.C. § 3583(e)(3).

■ The district court conducted a hearing on the events that involved Lomayaoma's conduct on August 2, 1994. Defense counsel cross-examined the government's witnesses and was given the opportunity to introduce evidence on behalf of Lomayaoma. After considering the testimony of Mary and Jane, as well as the evaluation of the Hopi Children's Court Counselor, the district court determined that the testimony of the two

---

6. We also note that Chief Justice Rehnquist wrote for the Court in *Seminole Tribe* (1996), *Lopez* (1995), *Negonsott* (1993), and *Oliphant* (1978). We do not read his most recent opinions in *Seminole Tribe* and *Lopez* as undermining his earlier opinions that deal directly with the Indian Major Crimes Act.

girls was credible. The court then concluded that Lomayaoma had touched the two girls in a manner that would constitute a crime under 18 U.S.C. § 2246.

Lomayaoma argues that the evidence was insufficient to support a violation under 18 U.S.C. § 2246 because there was no evidence that he intended to "abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246. But for purposes of a supervised release revocation hearing, the district court need only conclude that a preponderance of the evidence supports the conclusion that Lomayaoma violated 18 U.S.C. § 2246. The district court explained:

> The purposes or reasons why Mr. Lomayaoma might have been there and might have done—or did do those things, as I find that he did, it's reasonable to infer that he was doing it with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person, himself, by those acts.

A preponderance of the evidence in the record supports the district court's determination that Lomayaoma intended to abuse or at the very least harass Mary and Jane on the morning of August 2, 1994.

### IV

For the reasons stated above, the district court's order is AFFIRMED.