Filed: June 20, 2000

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

No. 99-1218
(CA-97-41-4-BO)

---

Charles Gilbert Gibbs, et al.,

                              Plaintiffs - Appellants,

        versus

Bruce Babbitt, etc., et al.,

                              Defendants - Appellees.

---

O R D E R

---

The court amends its opinion filed June 6, 2000, as follows:

On page 36, fourth full paragraph, line 5 -- the cross-reference is corrected to read "Ante at 17."

                              For the Court - By Direction


                              /s/ Patricia S. Connor
                              Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHARLES GILBERT GIBBS; RICHARD
LEE MANN, III; HYDE COUNTY,
NORTH CAROLINA; WASHINGTON
COUNTY, NORTH CAROLINA,
Plaintiffs-Appellants,

v.

BRUCE BABBITT, Secretary of the
Interior, in his official capacity;
UNITED STATES FISH  AND WILDLIFE
SERVICE; UNITED STATES
DEPARTMENT OF THE INTERIOR; JAMIE
CLARK, Director of the U.S. Fish
and Wildlife Service,
Defendants-Appellees,                                        No. 99-1218

DEFENDERS OF WILDLIFE,
Intervenor-Appellee.

PACIFIC LEGAL FOUNDATION;
NATIONAL WILDERNESS INSTITUTE;
WASHINGTON LEGAL FOUNDATION;
THE ALLIED EDUCATION FOUNDATION;
NATIONAL WILDLIFE FEDERATION;
NORTH CAROLINA WILDLIFE
FEDERATION; ENVIRONMENTAL
DEFENSE FUND; WORLD WILDLIFE
FUND; CENTER FOR MARINE
CONSERVATION,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
Terrence W. Boyle, Chief District Judge.
(CA-97-41-4-BO)

Argued: October 28, 1999

Decided: June 6, 2000

Before WILKINSON, Chief Judge, and LUTTIG
and MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
majority opinion, in which Judge Michael joined. Judge Luttig wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Sean Eric Andrussier, WOMBLE, CARLYLE, SAN-
DRIDGE & RICE, P.L.L.C., Raleigh, North Carolina, for Appellants.
Andrew Christopher Mergen, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C.; Timothy Joseph Preso, MILLER,
CASSIDY, LARROCA & LEWIN, L.L.P., Washington, D.C., for
Appellees. **ON BRIEF:** E. Lawrence Davis, III, Christopher T.
Graebe, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C.,
Raleigh, North Carolina, for Appellants. Peter Coppelman, Acting
Assistant Attorney General, David C. Shilton, Charles Carson, Envi-
ronmental & Natural Resources Division, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C.; John Ebersole,
David Gayer, UNITED STATES DEPARTMENT OF THE INTE-
RIOR, Washington, D.C., for Federal Appellees. Scott L. Nelson,
MILLER, CASSIDY, LARROCA & LEWIN, L.L.P., Washington,
D.C.; Katherine Meyer, MEYER & GLITZENSTEIN, Washington,
D.C.; Derb S. Carter, Jr., SOUTHERN ENVIRONMENTAL LAW
CENTER, Chapel Hill, North Carolina, for Appellee Defenders of
Wildlife. M. Reed Hopper, Anne M. Hayes, PACIFIC LEGAL
FOUNDATION, Sacramento, California, for Amici Curiae Pacific
Legal Foundation, et al. Daniel J. Popeo, Paul D. Kamenar, WASH-
INGTON LEGAL FOUNDATION, Washington, D.C., for Amici
Curiae Washington Legal Foundation, et al. James B. Dougherty,
Washington, D.C., for Amici Curiae National Wildlife Federation, et

2

al. Louis R. Cohen, James R. Wrathall, Matthew A. Brill, Susan A. MacIntyre, WILMER, CUTLER & PICKERING, Washington, D.C.; Michael J. Bean, ENVIRONMENTAL DEFENSE FUND, Washington, D.C.; Christopher E. Williams, WORLD WILDLIFE FUND, Washington, D.C.; Wm. Robert Irvin, CENTER FOR MARINE CONSERVATION, Washington, D.C., for Amici Curiae Environmental Defense Fund, et al.

_____

**OPINION**

WILKINSON, Chief Judge:

In this case we ask whether the national government can act to conserve scarce natural resources of value to our entire country. Appellants challenge the constitutionality of a Fish and Wildlife Service regulation that limits the taking of red wolves on private land. The district court upheld the regulation as a valid exercise of federal power under the Commerce Clause. We now affirm because the regulated activity substantially affects interstate commerce and because the regulation is part of a comprehensive federal program for the protection of endangered species. Judicial deference to the judgment of the democratic branches is therefore appropriate.

I.

A.

In response to growing concern over the extinction of many animal and plant species, Congress enacted the Endangered Species Act of 1973 (ESA), Pub. L. 93-205, 81 Stat. 884 (codified as amended at 16 U.S.C. §§ 1531-44 (1994 & Supp. III 1997)). Congress found that many of the species threatened with extinction are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3) (1994). Congress also found that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation." Id. § 1531(a)(1). To address these national concerns, the

3

ESA sets forth a comprehensive regulatory scheme to conserve these species and the ecosystems upon which they depend. The Act provides, inter alia, for the listing of "endangered" and "threatened" species, id. § 1533, and various recovery plans for the "conservation and survival" of listed species, id. § 1533(f).

The cornerstone of the statute is section 9(a)(1), which prohibits the taking of any endangered species without a permit or other authorization. Id. § 1538(a)(1)(B). The term "take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." Id. § 1532(19). The ESA also authorizes the Fish and Wildlife Service (FWS) to issue any necessary regulations for the conservation of threatened species. Id. § 1533(d). Finally, in keeping with its commitment to species conservation, the ESA states that a state law may be more restrictive than the provisions of the Act, but not less. Id. § 1535(f).

In order to increase the Service's flexibility in reintroducing endangered species into portions of their historic range, Congress extensively amended the ESA in 1982, Pub. L. 97-304, 96 Stat. 1426. Prior to 1982, reintroduced species were treated the same as any other endangered species. See id. § 1536 & 1538(a) (providing for stringent consultation and reporting requirements and a near absolute prohibition on the taking of endangered species). These strict limits led to significant local opposition to the reintroductions. In response to these problems, Congress added section 10(j), which allows the FWS to designate as "experimental" some reintroduced populations of endangered or threatened species. Id. § 1539(j). Under the looser standards of section 10(j), members of an experimental population are generally to be treated as threatened rather than endangered. Id. § 1539(j)(2)(C). This means that protective regulations may be established for their conservation. See id. at 1533(d). By promulgating special rules for an experimental population the Service can determine which prohibitions and exceptions shall apply. See 50 C.F.R.§ 17.82 (1998).

A population may be designated as "experimental" only after the Service determines that it is not "essential" to the continuation of the species. Id. § 1539(j)(2)(B). An experimental population located on private land can be exempt from some of the more stringent requirements for endangered species. See id. § 1539(j)(2)(C)(i). If a popula-

4

tion is found to be "non-essential" and is designated as "experimental," the FWS can develop "special regulations for each experimental population that will address the particular needs of that population." H.R. Rep. No. 97-567, at 34 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2834. Furthermore, "there will be instances where the regulations allow for the incidental take of experimental populations." Id. Thus, under section 10(j), the FWS has the authority to promulgate regulations allowing the taking of experimental reintroduced populations under limited circumstances.

B.

The red wolf, Canis rufus, is an endangered species whose protection is at issue in this case. The red wolf was originally found throughout the southeastern United States. It was once abundant in the "riverine habitats of the southeast," and was especially numerous near the "canebrakes" that harbored large populations of swamp and marsh rabbits, the primary prey of the red wolf. 51 Fed. Reg. 41,790, 41,791 (1986). The FWS found that "the demise of the red wolf was directly related to man's activities, especially land changes, such as the drainage of vast wetland areas for agricultural purposes . . . and predator control efforts at the private, State, and Federal levels." Id.

Activities such as wetlands drainage, dam construction, and hunting reduced the red wolf to such meager numbers that it was listed as endangered in 1976. See 32 Fed. Reg. 4001 (1976). Because of the paucity of animals left in the wild, their poor physical condition, and the threats posed by inbreeding, the FWS decided to trap the remaining red wolves in the mid-1970s and place them in a captive breeding program. See 51 Fed. Reg. at 41,791. The breeding program anticipated the eventual reintroduction of some red wolves into the wild. Id.

In 1986, the FWS issued a final rule outlining a reintroduction plan for red wolves in the 120,000-acre Alligator River National Wildlife Refuge in eastern North Carolina. See 51 Fed. Reg. 41,790. This area was judged the ideal habitat within the red wolf's historic range. Id. at 41,791. Between 1987 and 1992, a total of 42 wolves were released in the Refuge. In 1993, the reintroduction program was expanded to include the release of red wolves in the Pocosin Lakes National Wild-

5

life Refuge in Tennessee. Since reintroduction, some red wolves have wandered from federal refuges onto private property. From available data, as of February 1998 it was estimated that about 41 of the approximately 75 wolves in the wild may now reside on private land.[1]

This case raises a challenge to 50 C.F.R. § 17.84(c), a regulation governing the experimental populations of red wolves reintroduced into North Carolina and Tennessee pursuant to section 10(j). The FWS has extended the takings prohibitions of section 9(a)(1) to the experimental red wolf populations with certain exceptions. See 50 C.F.R. § 17.84(c) (1998). As noted above, the taking provision of section 9(a)(1) prevents landowners from harassing, harming, pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting any endangered species. See 16 U.S.C. § 1532(19). However, in order to insure that other agencies and the public would accept the proposed reintroduction, the FWS relaxed the taking standards for wolves found on private land under its authority over experimental populations.

Section 17.84(c) allows a person to take red wolves on private land "[p]rovided that such taking is not intentional or willful, or is in defense of that person's own life or the lives of others." Id. § 17.84(c)(4)(i). Private landowners may also take red wolves on their property "when the wolves are in the act of killing livestock or pets, Provided that freshly wounded or killed livestock or pets are evident." Id. § 17.84(c)(4)(iii). A landowner may also "harass red wolves found on his or her property . . . Provided that all such harassment is by methods that are not lethal or injurious to the red wolf." Id. § 17.84(c)(4)(iv). Finally, landowners may take red wolves after efforts by Service personnel to capture such animals have been abandoned, and such taking has been approved in writing. Id. § 17.84(c)(4)(v). All of these exceptions to the taking prohibition are subject to a 24-hour reporting requirement. Id. § 17.84(c)(4).

_____

[1] The Service notes that the red wolf population lies between 53 and 101 wolves, and estimates that the actual population is between 70 and 80 animals. The district court also found that approximately 75 red wolves were living in the wild in eastern North Carolina. See Gibbs v. Babbitt, 31 F. Supp. 2d 531, 534 (E.D.N.C. 1998).

C.

In October 1990, plaintiff Richard Lee Mann shot a red wolf that he feared might threaten his cattle. The federal government prosecuted Mann under § 17.84(c), and Mann pled guilty. Mann's prosecution triggered some opposition to the red wolf program in the surrounding communities. After the program was in place for several years, the FWS held meetings with local governments and the public to receive feedback about the reintroductions. The Service contended that most people who commented expressed support for the program and that the reintroductions were generally supported by local, state and federal agencies, and elected officials. See 58 Fed. Reg. 62,086, 62,088 (1993). In addition, owners of nearly 200,000 acres of private land have permitted red wolves onto their land through agreements with the FWS. Nonetheless, Hyde and Washington Counties, and the towns of Belhaven and Roper, passed resolutions opposing the reintroduction of the wolves. The resolutions appeared to be based on the farming community's fears of prohibitions on private land use. Id.

In response to discontent with the reintroduction program, the North Carolina General Assembly passed a bill entitled "An Act to Allow the Trapping and Killing of Red Wolves by Owners of Private Land." The Act makes it lawful to kill a red wolf on private property if the landowner has previously requested the FWS to remove the red wolves from the property. See 1994 N.C. Sess. Laws Ch. 635, amended by 1995 N.C. Sess. Laws Ch. 83 (adding Beaufort and Craven Counties to the Act, which initially covered only Hyde and Washington Counties). This law facially conflicts with the federal regulation. For instance, § 17.84(c) allows the taking of red wolves "when the wolves are in the act of killing livestock or pets," when wounded or dead livestock or pets are evident and the taking is reported within 24 hours. See 50 C.F.R.§ 17.84(c)(4)(iii). By contrast, the North Carolina statute makes it lawful to kill a red wolf on private property when the landowner "reasonably believes" that the wolf may be a threat to people or livestock and the"landowner has previously requested the [FWS] to remove the red wolves from the landowner's property." See 1994 N.C. Sess. Laws Ch. 635, § 1. The government reports, however, that no actual conflicts between these laws have arisen, because there have been no contested state or fed-

eral prosecutions for unlawful takes since the North Carolina statute was enacted.

Appellants Charles Gibbs, Richard Mann, Hyde County, and Washington County filed the instant action challenging the federal government's authority to protect red wolves on private land. They seek a declaration that the anti-taking regulation, 50 C.F.R. § 17.84(c), as applied to the red wolves occupying private land in eastern North Carolina, exceeds Congress's power under the interstate Commerce Clause, U.S. Const. art. I, § 8, cl. 3 ("Congress shall have Power . . . To regulate Commerce . . . among the several States . . ."). Appellants also seek an injunction against continued enforcement of the anti-taking regulation on non-federal land. Appellants claim that the red wolves have proven to be a "menace to citizens and animals in the Counties." They further allege that because of the federal regulatory protections surrounding the wolves, North Carolinians cannot effectively defend their property.

On cross-motions for summary judgment, the United States District Court for the Eastern District of North Carolina held that Congress's power to regulate interstate commerce includes the power to regulate conduct that might harm red wolves on private land. See Gibbs v. Babbitt, 31 F. Supp. 2d 531 (E.D.N.C. 1998). The district court found that the red wolves are "things in interstate commerce" because they have moved across state lines and their movement is followed by "tourists, academics, and scientists." Id. at 535. The court also found that the tourism they generate substantially affects interstate commerce. See id. The private landowners and North Carolina Counties now appeal.

II.

We consider this case under the framework articulated by the Supreme Court in United States v. Lopez, 514 U.S. 549 (1995), and United States v. Morrison, No. 99-5, 2000 WL 574361 (May 15, 2000), aff'g Brzonkala v. Virginia Polytechnic Institute and State University, 169 F.3d 820 (4th Cir. 1999). While Congress's power to pass laws under the Commerce Clause has been interpreted broadly, both Lopez and Morrison reestablish that the commerce power contains "judicially enforceable outer limits." See Lopez, 514 U.S. at 566;

8

Morrison, 2000 WL 574361, at *6. It is essential to our system of government that the commerce power not extend to effects on interstate commerce that are so remote that we "would effectually obliterate the distinction between what is national and what is local." National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37 (1937). Indeed, the judiciary has the duty to ensure that federal statutes and regulations are promulgated under one of the enumerated grants of constitutional authority. It is our further duty to independently evaluate whether "a rational basis exist[s] for concluding that a regulated activity sufficiently affect[s] interstate commerce." Lopez, 514 U.S. at 557.

While this is rational basis review with teeth, the courts may not simply tear through the considered judgments of Congress. Judicial restraint is a long and honored tradition and this restraint applies to Commerce Clause adjudications. "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." Morrison, 2000 WL 574361, at *6. In fact, "[t]he substantial element of political judgment in Commerce Clause matters leaves our institutional capacity more in doubt than when we decide cases, for instance, under the Bill of Rights." Lopez, 514 U.S. at 579 (Kennedy, J., concurring). We must enforce the structural limits of Our Federalism, but we must also defer to the political judgments of Congress, recognizing that the "Commerce Clause represents a broad grant of federal authority." Brzonkala v. Virginia Polytechnic Instit. and State Univ., 169 F.3d 820, 830 (4th Cir. 1999), aff'd sub nom. Morrison, 2000 WL 574361.

The Lopez Court recognized three broad categories of activity that Congress may regulate under its commerce power. 514 U.S. at 558. "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." Id. at 558-59 (citations omitted).

9

Section 17.84(c) is "not a regulation of the use of the channels of interstate commerce, nor is it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce." Lopez, 514 U.S. at 559. The term "channel of interstate commerce" refers to, inter alia, "navigable rivers, lakes, and canals of the United States; the interstate railroad track system; the interstate highway system; . . . interstate telephone and telegraph lines; air traffic routes; television and radio broadcast frequencies." United States v. Miles, 122 F.3d 235, 245 (5th Cir. 1997). This regulation of red wolf takings on private land does not target the movement of wolves or wolf products in the channels of interstate commerce.

This case also does not implicate Lopez's second prong, which protects things in interstate commerce. Although the Service has transported the red wolves interstate for the purposes of study and the reintroduction programs, this is not sufficient to make the red wolf a "thing" in interstate commerce. See, e.g., Lopez, 514 U.S. at 559 (rejecting application of prong two to Gun-Free School Zones Act, despite the fact that the regulated guns likely traveled through interstate commerce); National Assoc. of Home Builders v. Babbitt, 130 F.3d 1041, 1046 (D.C. Cir. 1997) ("NAHB") (rejecting notion that Delhi Sands Flower-Loving Fly was a "thing" in interstate commerce). Therefore, if 50 C.F.R. § 17.84(c) is within the commerce power, it must be sustained under the third prong of Lopez.

Under the third Lopez test, regulations have been upheld when the regulated activities "arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." Lopez, 514 U.S. at 561. In Morrison, the Supreme Court noted, "In every case where we have sustained federal regulation under Wickard's aggregation principle, the regulated activity was of an apparent commercial character." Morrison, 2000 WL 574361, at *37 n.4. The Court in Lopez likewise placed great emphasis on the "commercial concerns that are central to the Commerce Clause." Lopez, 514 U.S. at 583 (Kennedy, J., concurring); see also Hoffman v. Hunt, 136 F.3d 575, 586-87 (4th Cir. 1997) (noting the importance of the distinction between "the regulation of, on the one hand, those activities that are commercial or economic in nature. . . and, on the other hand, those activities that are not").

10

Although the connection to economic or commercial activity plays a central role in whether a regulation will be upheld under the Commerce Clause, economic activity must be understood in broad terms. Indeed, a cramped view of commerce would cripple a foremost federal power and in so doing would eviscerate national authority. The Lopez Court's characterization of the regulation of home-grown wheat in Wickard v. Filburn, 317 U.S. 111 (1942), as a case involving economic activity makes clear the breadth of this concept. The Court explained that "[e]ven Wickard, which is perhaps the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not." Lopez, 514 U.S. at 560; accord Morrison, 2000 WL 574361, at *7. See also Brzonkala, 169 F.3d at 835 (explaining that the Court has a "relatively broad understanding of such [economic] activity"). In fact, our understanding of commerce may not be limited to its "18th-century" forms. See Lopez, 514 U.S. at 574 (Kennedy, J., concurring). While we must enforce meaningful limits on the commerce power, we must also be mindful of the "Court's relatively generous conception of economic activity." Brzonkala, 169 F.3d at 835.

Lopez and Morrison rest on the principle that where a federal statute has only a tenuous connection to commerce and infringes on areas of traditional state concern, the courts should not hesitate to exercise their constitutional obligation to hold that the statute exceeds an enumerated federal power. Respect for our federal system of government was integral to those decisions. See Lopez, 514 U.S. at 561 n.3; Morrison, 2000 WL 574361, at *11. Yet Lopez also counsels that "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." 514 U.S. at 560. In enforcing limits on the Congress, we must be careful not to overstep the judicial role. To strike down statutes that bear substantially upon commerce is to overstep our own authority even as we fault Congress for exceeding limits on its power. The irony of disregarding limits on ourselves in the course of enforcing limits upon others will assuredly not be lost on those who look to courts to respect restraints imposed by rules of law.

With these basic principles in mind, we consider appellants' challenge to § 17.84(c).

11

III.

Appellants argue that the federal government cannot limit the taking of red wolves on private land because this activity cannot be squared with any of the three categories that Congress may regulate under its commerce power. Appellants assert that 50 C.F.R. § 17.84(c) is therefore beyond the reach of congressional authority under the Commerce Clause.

We disagree. It was reasonable for Congress and the Fish and Wildlife Service to conclude that § 17.84(c) regulates economic activity. The taking of red wolves implicates a variety of commercial activities and is closely connected to several interstate markets. The regulation in question is also an integral part of the overall federal scheme to protect, preserve, and rehabilitate endangered species, thereby conserving valuable wildlife resources important to the welfare of our country. Invalidating this provision would call into question the historic power of the federal government to preserve scarce resources in one locality for the future benefit of all Americans.

A.

To fall within Congress's commerce power, this regulation must have a "substantial relation to interstate commerce" -- it must "substantially affect interstate commerce." Lopez , 514 U.S. at 559. The Supreme Court recently emphasized that "in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." Morrison, 2000 WL 574361, at *8. Intrastate activities may be subject to federal regulation if they have a "meaningful connection with[a] particular, identifiable economic enterprise or transaction." Brzonkala, 169 F.3d at 834. We therefore must consider whether the taking of red wolves on private land is "in any sense of the phrase, economic activity." Morrison, 2000 WL 574361, at *9.

Unlike the Violence Against Women Act (VAWA) in Morrison and the Gun-Free School Zones Act (GFSZA) in Lopez, § 17.84(c) regulates what is in a meaningful sense economic activity. The Court in Morrison explained that both the VAWA and the GFSZA involved

12

activity that was noneconomic and only tenuously linked to interstate commerce. 2000 WL 574361, at *7-9. Yet the taking of a red wolf on private land is unlike gender-motivated violence or guns near schools. The protection of commercial and economic assets is a primary reason for taking the wolves. Farmers and ranchers take wolves mainly because they are concerned that the animals pose a risk to commercially valuable livestock and crops. Indeed, appellants' arguments focus quite explicitly on these economic concerns -- they want freer rein to protect their property and investments in the land. See Appellants' Br. at 10 ("In the face of these threats [from red wolves], North Carolinians cannot effectively defend their property."); id. at 12.

The relationship between red wolf takings and interstate commerce is quite direct -- with no red wolves, there will be no red wolf related tourism, no scientific research, and no commercial trade in pelts. We need not "pile inference upon inference," Lopez, 514 U.S. at 567, to reach this conclusion. While a beleaguered species may not presently have the economic impact of a large commercial enterprise, its eradication nonetheless would have a substantial effect on interstate commerce. And through preservation the impact of an endangered species on commerce will only increase.[2]

Because the taking of red wolves can be seen as economic activity in the sense considered by Lopez and Morrison, the individual takings may be aggregated for the purpose of Commerce Clause analysis. See Morrison, 2000 WL 574361, at *37 n.4. While the taking of one red wolf on private land may not be "substantial," the takings of red wolves in the aggregate have a sufficient impact on interstate commerce to uphold this regulation. This is especially so where, as here, the regulation is but one part of the broader scheme of endangered species legislation.

_____

[2] While the regulation might also reflect a moral judgment concerning the importance of rehabilitating endangered species, this does not undermine the economic basis for the regulation. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 257 (1964) ("Congress was not restricted by the fact that the particular obstruction to interstate commerce with which it was dealing was also deemed a moral and social wrong.").

13

Further, § 17.84(c) is closely connected to a variety of interstate economic activities.**3** Whether the impact of red wolf takings on any one of these activities qualifies as a substantial effect on interstate commerce is something we need not address. We have no doubt that the effect of the takings on these varied activities in combination qualifies as a substantial one. The first nexus between the challenged regulation and interstate commerce is tourism. The red wolves are part of a $29.2 billion national wildlife-related recreational industry that involves tourism and interstate travel. See Heart of Atlanta Motel, 379 U.S. at 256 (finding it is well-established that "[c]ommerce among the States . . . consists of intercourse and traffic between their citizens" (internal quotation marks omitted)). Many tourists travel to North Carolina from throughout the country for "howling events" --

_____

**3** The Supreme Court has admonished us that "[t]he task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding." Hodel v. Virginia Surface Mining & Reclamation Assoc., 452 U.S. 264, 276 (1981).

While there are no formal congressional findings that the ESA affects interstate commerce, such findings are neither necessary nor sufficient to sustain a statute or regulation. In Lopez, the Court said that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." 514 U.S. at 562; see also Perez v. United States, 402 U.S. 146, 156 (1971) (particularized findings are not necessary for Congress to legislate). Further, in Morrison, the Court emphasized in the face of voluminous congressional findings that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." 2000 WL 574361, at *10.

In evaluating whether there is a rational basis for the promulgation of a statute or regulation under the commerce power, we often consider congressional committee findings. See Lopez, 514 U.S. at 562. Here, Congress has provided numerous sources of informal findings. Committee reports and legislative debates have emphasized the importance of endangered species to interstate commerce. We independently evaluate the constitutionality of this regulation, but we also take account of congressional judgment and the judgment of the agency designated to implement the statute.

14

evenings of listening to wolf howls accompanied by educational programs. These howlings are a regular occurrence at the Alligator River National Wildlife Refuge. According to a study conducted by Dr. William E. Rosen of Cornell University, the recovery of the red wolf and increased visitor activities could result in a significant regional economic impact. See William E. Rosen, Red Wolf Recovery in Northeastern North Carolina and the Great Smoky Mountains National Park: Public Attitudes and Economic Impacts (unpublished, Joint Appendix at 633). Rosen estimates that northeastern North Carolina could see an increase of between $39.61 and $183.65 million per year in tourism-related activities, and that the Great Smoky Mountains National Park could see an increase of between $132.09 and $354.50 million per year. This is hardly a trivial impact on interstate commerce. Appellants understandably seek to criticize the Rosen study, but concede that the howling events attract interstate tourism and that red wolf program volunteers come from all around the country.

Appellants argue that the tourism rationale relates only to howling events on national park land or wildlife refuges because people do not travel to private land. They reason that without tourism on private land the regulated activity does not substantially affect interstate commerce. Yet this argument misses the mark. Since reintroduction, red wolves have strayed from federal lands onto private lands. Indeed, wolves are known to be "great wanderers." See 60 Fed. Reg. 18,940, 18,943 (1995). In 1998, it was estimated that 41 of the 75 wolves in the wild now live on private land. Because so many members of this threatened species wander on private land, the regulation of takings on private land is essential to the entire program of reintroduction and eventual restoration of the species. Such regulation is necessary to conserve enough red wolves to sustain tourism. Appellants in fact seem unmindful of the history of endangered species regulation. The Endangered Species Acts of 1966 and 1969 initially targeted conservation efforts only on federal lands, but they met with limited success. See Note, Evolution of Wildlife Legislation in the United States: An Analysis of the Legal Efforts to Protect Endangered Species and the Prospects for the Future, 5 Geo. Int'l Envtl. L. Rev. 441, 449-53 (1993). The Endangered Species Act of 1973 was motivated in part by the need to extend takings regulation beyond the limited confines of federal land. See id. at 556. The prohibition of takings on private

15

land was critical to the overall success of the ESA in halting and reversing the near extinction of numerous species. See 16 U.S.C. § 1538(a)(1). The success of many commercial enterprises depends on some regulation of activity on private land, and interstate tourism is no exception.

Tourism, however, is not the only interstate commercial activity affected by the taking of red wolves. The regulation of red wolf takings is also closely connected to a second interstate market -- scientific research. Scientific research generates jobs. It also deepens our knowledge of the world in which we live. The red wolf reintroduction program has already generated numerous scientific studies. For example, the red wolf is used as a model for other carnivore reintroductions. See Donald E. Moore III & Roland Smith, The Red Wolf as a Model for Carnivore Re-introductions, 62 Symp. Zool. Soc. Lond. 263 (1990). Scientists have also studied how the red wolf affects small mammal populations and how the wolves interact with the ecosystem as a whole. See, e.g., Bryan T. Kelly, Alligator River National Wildlife Refuge Red Wolf (Canis Rufus) Scat Analysis: Preliminary Analyses of Mammalian Prey Consumed by Year, Season, Pack, Sex, and Age (April 1994) (unpublished, Joint Appendix at 942). By studying the effects of red wolves on the ecosystem, scientists learn about the interdependence of plants and animals, as well as how other threatened species may be reintroduced in the future. Scientific research can also reveal other uses for animals -- for instance, approximately 50 percent of all modern medicines are derived from wild plants or animals. See Norman Myers, A Wealth of Wild Species: Storehouse for Human Welfare 4 (1983). Protection of the red wolves on private land thus encourages further research that may have inestimable future value, both for scientific knowledge as well as for commercial development of the red wolf.

The anti-taking regulation is also connected to a third market -- the possibility of a renewed trade in fur pelts. Wolves have historically been hunted for their pelts. See Stanley P. Young & Edward A. Goldman, The Wolves of North America I, 165-70 (1964). Congress had the renewal of trade in mind when it enacted the ESA. The Senate Report noted that the protection of an endangered species "may permit the regeneration of that species to a level where controlled exploitation of that species can be resumed. In such a case businessmen may

16

profit from the trading and marketing of that species for an indefinite number of years, where otherwise it would have been completely eliminated from commercial channels." S. Rep. No. 91-526, at 3 (1969), reprinted in 1969 U.S.C.C.A.N. 1413, 1415. The American alligator is a case in point. In 1975, the American alligator was nearing extinction and listed as endangered, but by 1987 conservation efforts restored the species. Now there is a vigorous trade in alligator hides. See Catharine L. Krieps, Sustainable Use of Endangered Species Under CITES: Is it a Sustainable Alternative?, 17 U. Pa. J. Int'l Econ. L. 461, 479-80 (1996) (explaining that many environmentalists are now encouraging the purchase of alligator products to create an incentive for protecting alligators and their habitats). Although alligator hides have more recently been a part of interstate commercial trade and red wolves were sold for their pelts primarily in the nineteenth century, this temporal difference is beside the point. It is not for the judiciary to move from species to species, opining that species A possesses great commercial potential, but species B does not. Assessing the relative scientific value and commercial impact of alligators and red wolves is for Congress and the FWS, informed as they are by biologists, economists, and others whose expertise is best delivered to the political branches, not the courts.

Finally, the taking of red wolves is connected to interstate markets for agricultural products and livestock. For instance, appellant landowners find red wolves a menace because they threaten livestock and other animals of economic and commercial value. By restricting the taking of red wolves, § 17.84(c) is said to impede economic development and commercial activities such as ranching and farming. This effect on commerce, however, still qualifies as a legitimate subject for regulation. It is well-settled under Commerce Clause cases that a regulation can involve the promotion or the restriction of commercial enterprises and development. Indeed, "[t]he motive and purpose of a regulation of interstate commerce are matters for the legislative judgment." United States v. Darby, 312 U.S. 100, 115 (1941). We recognize that "Congress can regulate interstate commerce for any lawful motive." United States v. Soderna, 82 F.3d 1370, 1374 (7th Cir. 1996). The regulation here targets takings that are economically motivated -- farmers take wolves to protect valuable livestock and crops. It is for Congress, not the courts, to balance economic effects -- namely whether the negative effects on interstate commerce from red

wolf predation are outweighed by the benefits to commerce from a restoration of this species. To say that courts are ill-suited for this act of empirical and political judgment is an understatement.

It is anything but clear, for example, that red wolves harm farming enterprises. They may in fact help them, and in so doing confer additional benefits on commerce. For instance, red wolves prey on animals like raccoons, deer, and rabbits -- helping farmers by killing the animals that destroy their crops. See Robert J. Esher & Theodore R. Simons, Red Wolf Propagation on Horn Island, Miss.: Red Wolf Ecological Studies 13-16 (Sept. 1993) (unpublished, Joint Appendix at 890). On Horn Island, for instance, researchers found evidence of increased shore bird nesting, likely due to the reduction in raccoon predation. See id. at 15. In Tennessee Valley Authority v. Hill ("TVA"), the Supreme Court recognized that one of Congress's primary concerns in enacting the ESA was "the unknown uses that endangered species might have and about the unforeseeable place such creatures may have in the chain of life on this planet." 437 U.S. 153, 178-79 (1978). It is within the power of Congress to regulate the coexistence of commercial activity and endangered wildlife in our nation and to manage the interdependence of endangered animals and plants in large ecosystems. It is irrelevant whether judges agree or disagree with congressional judgments in this contentious area. Given the existing economic and commercial activity involving red wolves and wildlife generally, Congress could find that conservation of endangered species and economic growth are mutually reinforcing. It is simply not beyond the power of Congress to conclude that a healthy environment actually boosts industry by allowing commercial development of our natural resources.

Section 17.84(c) aims to reverse threatened extinction and conserve the red wolf for both current and future use in interstate commerce. Congress is entitled to make the judgment that conservation is potentially valuable, even if that value cannot be presently ascertained. The Supreme Court has held that the congressional decision to maintain abandoned railroad track is reasonable "even if no future rail use for it is currently foreseeable." Preseault v. ICC, 494 U.S. 1, 19 (1990). The Court reasoned that "[g]iven the long tradition of congressional regulation of railroad abandonments, that is a judgment that Congress is entitled to make." Id. (citations omitted). Similarly, Congress has

18

long been involved in the regulation of scarce and vital natural resources. The full payoff of conservation in the form of tourism, research, and trade may not be foreseeable. Yet it is reasonable for Congress to decide that conservation of species will one day produce a substantial commercial benefit to this country and that failure to preserve a species will result in permanent, though unascertainable, commercial loss.

When enacting the ESA, various legislators expressed these exact concerns, namely that species be conserved for future scientific development:

> The value of this genetic heritage is, quite literally, incalculable. . . . From the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations. The reason is simple: they are potential resources. . . . Who knows, or can say, what potential cures for cancer or other scourges, present or future, may lie locked up in the structures of plants which may yet be undiscovered, much less analyzed? . . . Sheer self-interest impels us to be cautious.

H.R. Rep. No. 93-412, at 4-5 (1973). Extinction, after all, is irreversible. If a species becomes extinct, we are left to speculate forever on what we might have learned or what we may have realized. If we conserve the species, it will be available for the study and benefit of future generations. In any event, it is for Congress to choose between inaction and preservation, not for the courts.

Courts have uniformly upheld endangered species legislation after Lopez based on many of the same current and future connections to interstate commerce articulated here. In fact, no case has been brought to our attention that invalidates any endangered species regulation for exceeding the commerce power. In addressing a post-Lopez challenge to the constitutionality of the Bald Eagle Protection Act, 16 U.S.C. § 668 (1994), the Ninth Circuit found that"[e]xtinction of the eagle would substantially affect interstate commerce by foreclosing any possibility of several types of commercial activity: future commerce in eagles or their parts; future interstate travel for the purpose of observing or studying eagles; or future commerce in beneficial prod-

19

ucts derived either from eagles or from analysis of their genetic material." United States v. Bramble, 103 F.3d 1475, 1481 (9th Cir. 1996). Similarly, "[g]iven the interconnectedness of species and ecosystems, it is reasonable to conclude that the extinction of one species affects others and their ecosystems and that the protection of a purely intrastate species . . . will therefore substantially affect land and objects that are involved in interstate commerce." See NAHB, 130 F.3d at 1059 (Henderson, J., concurring). In addition, the District of Columbia District Court upheld application of the ESA to the fairy shrimp, a severely endangered species limited to one state. See Building Indus. Assoc. of Superior Cal. v. Babbitt, 979 F. Supp. 893 (D.D.C. 1997). The court declined to "read Lopez as hamstringing Congress in such an irrational fashion in a regulatory area of such important economic, scientific and environmental dimensions." Id. at 908. Pre-Lopez cases reached similar results. See, e.g., Hoffman Homes, Inc. v. Administrator, 999 F.2d 256, 261 (7th Cir. 1993); Palila v. Hawaii Dep't of Land and Natural Resources, 471 F. Supp. 985, 995 (D. Haw. 1979), aff'd, 639 F.2d 495 (9th Cir. 1981).

The protection of the red wolf on both federal and private land substantially affects interstate commerce through tourism, trade, scientific research, and other potential economic activities. To overturn this regulation would start courts down the road to second-guessing all kinds of legislative judgments. There is a "rational basis" as defined by Lopez for sustaining this regulation. We therefore hold that the anti-taking provision at issue here involves regulable economic and commercial activity as understood by current Commerce Clause jurisprudence.[4]

B.

This regulation is also sustainable as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514

_____

[4] Intervenor-appellees Defenders of Wildlife argue that this regulation can also be upheld under the treaty power. See U.S. Const. art. VI., cl. 2; U.S. Const. art. II, § 2, cl. 2. Because we hold that § 17.84(c) is valid under the Commerce Clause, we need not address this alternative argument.

20

U.S. at 561. The Supreme Court in <u>Hodel v. Indiana</u> stated: "A complex regulatory program . . . can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test." 452 U.S. 314, 329 n.17 (1981).

The FWS issued this regulation pursuant to the provisions of the Endangered Species Act, a comprehensive and far-reaching piece of legislation that aims to conserve the health of our national environment. Congress undoubtedly has the constitutional authority to pass legislation for the conservation of endangered species. <u>See Babbitt v. Sweet Home Chapter of Communities for a Great Or.</u>, 515 U.S. 687 (1995) (presupposing validity of Endangered Species Act in upholding broad definition of "harm" as including significant habitat modification); <u>see also TVA v. Hill</u>, 437 U.S. at 194 (emphasizing that Congress has struck a balance in "favor of affording endangered species the highest of priorities" and upholding application of the ESA because "[o]nce the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end").

Appellants repeatedly argue that individual takings of red wolves have only an insubstantial effect on interstate commerce and therefore that the application of the regulation to private landowners is invalid. But we emphasize that the effect on commerce must be viewed not from the taking of one wolf, but from the potential commercial differential between an extinct and a recovered species. A single red wolf taking may be insubstantial by some measures, but that does not invalidate a regulation that is part of the ESA and that seeks conservation not only of any single animal, but also recovery of the species as a whole. The Supreme Court in <u>Lopez</u> was emphatic on this point: "`where <u>a general regulatory statute bears a substantial relation to commerce</u>, the <u>de minimis</u> character of individual instances arising under that statute is of no consequence.'" 514 U.S. at 558 (alteration in original) (quoting <u>Maryland v. Wirtz</u>, 392 U.S. 183, 197 n.27 (1968)); <u>see also Perez v. United States</u>, 402 U.S. 146, 154 (1971) ("Where the <u>class of activities</u> is regulated and that <u>class</u> is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." (internal quotation marks omitted)).

Once a species has been designated as endangered, there are by definition only a few remaining animals. Therefore, the effects on interstate commerce should not be viewed from the arguably small commercial effect of one local taking, but rather from the effect that single takings multiplied would have on advancing the extinction of a species. Each taking impacts the overall red wolf population, which has an effect on many dimensions of commerce between the states. As the Supreme Court has stated, "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." Heart of Atlanta Motel , 379 U.S. at 258 (internal quotation marks omitted). Section 17.84(c) must thus be evaluated against the overall congressional goal of restoring red wolves and endangered species generally. It would be perverse indeed if a species nearing extinction were found to be beyond Congress's power to protect while abundant species were subject to full federal regulatory power. Yet under appellants' theory, the more endangered the species, the less authority Congress has to regulate the taking of it. According to this view, endangered species would lie beyond congressional protection because there are too few animals left to make a commercial difference. Such reasoning would eviscerate the comprehensive federal scheme for conserving endangered species and turn congressional judgment on its head.

Appellants protest they do not ask us to overturn the ESA. They simply want us to excise as unconstitutional a disfavored provision that places a strain on their agricultural activities. But given that Congress has the ability to enact a broad scheme for the conservation of endangered species, it is not for the courts to invalidate individual regulations. If appellants think this regulation unwise, they must make their plea to Congress. The judiciary lacks the delegated powers of the FWS or the Environmental Protection Agency. Separation of powers principles mandate that we leave decisions such as these to Congress and to agencies with congressionally sanctioned expertise and authority. The Supreme Court itself has been mindful of the "degree of regulatory expertise necessary to [the ESA's] enforcement." Sweet Home, 515 U.S. at 703. Lacking such expertise, we must decide not whether the regulation meets with judicial favor, but whether it passes constitutional muster.

The specific needs of individual species, as well as the balance to be struck with landowners in or near the species' habitats, present a

22

classic case for legislative balancing. Here § 17.84(c) was promulgated precisely so that private landowners could take red wolves under certain circumstances. For instance, subject to certain reporting requirements, landowners can "take" wolves in self-defense, see 50 C.F.R. § 17.84(c)(4)(i), or when the wolves are found in the act of killing livestock or pets, see id. § 17.84(c)(4)(iii). Landowners can also harass wolves found on private property, provided that harassment is by methods that are not lethal or physically injurious to the red wolf, see id. § 17.84(c)(4)(iv). These provisions may ease tensions between the red wolves and private landowners. Without these special regulations, all red wolves would be subject to the absolute taking prohibition of section 9(a), placing a much greater burden on the property owner. Congress and the Service have decided that these experimental wolves can be taken under certain circumstances based on an evaluation of competing interests. How these lines should be drawn and this balance struck is grist for the legislative and administrative mill and beyond the scope of judicial competence.

IV.

Upholding this regulation is consistent with the"first principles" of a Constitution that establishes a federal government of enumerated powers. See Lopez, 514 U.S. at 552. Lopez and Morrison properly emphasize that we must carefully evaluate legislation in light of our federal system of government. "The Constitution requires a distinction between what is truly national and what is truly local." Morrison, 2000 WL 574361, at *11. We must particularly scrutinize regulated activity that "falls within an area of the law where States historically have been sovereign and countenance of the asserted federal power would blur the boundaries between the spheres of federal and state authority." Brzonkala, 169 F.3d at 837 (internal quotation marks omitted).

A.

It is imperative to set forth at the outset the historic roles of federal and state authority in this area. The regulated activity at issue here does not involve an "area of traditional state concern," one to which "States lay claim by right of history and expertise." Lopez, 514 U.S. at 580, 583 (Kennedy, J., concurring).

23

Appellants argue that the regulation infringes on the traditional state control over wildlife. We are cognizant that states play a most important role in regulating wildlife -- many comprehensive state hunting and fishing laws attest to it. State control over wildlife, however, is circumscribed by federal regulatory power. In Minnesota v. Mille Lacs Band of Chippewa Indians, the Supreme Court recently reiterated that "[a]lthough States have important interests in regulating wildlife and natural resources within their borders, this authority is shared with the Federal Government when the Federal Government exercises one of its enumerated constitutional powers." 526 U.S. 172, 204 (1999). In Mille Lacs, the Court upheld Chippewa Indian rights under an 1837 treaty that allowed the Chippewa to hunt, fish, and gather free of territorial, and later state, regulation. Id. These Indian treaty rights were found to be "reconcilable with state sovereignty over natural resources." Id. at 205.

It is true that in the nineteenth century courts followed the legal precept that wildlife was the property of the state. See Geer v. Connecticut, 161 U.S. 519 (1896) (upholding a Connecticut statute that prohibited the interstate transportation of game birds that had been killed within the state). But the principles in Geer were modified early in the twentieth century. See Hughes v. Oklahoma , 441 U.S. 322, 329 (1979) ("The erosion of Geer began only 15 years after it was decided."). Geer was finally overruled in 1979 by Hughes v. Oklahoma, which held that states do not own the wildlife within their borders and that state laws regulating wildlife are circumscribed by Congress's commerce power. 441 U.S. at 326, 335. In light of Mille Lacs and Hughes, the activity regulated by § 17.84(c) -- the taking of red wolves on private property -- is not an area in which the states may assert an exclusive and traditional prerogative in derogation of an enumerated federal power.

Appellants next argue that the application of this regulation to private land intrudes on the state's traditional police power to regulate local land use. Of course, states and localities possess broad regulatory and zoning authority over land within their jurisdictions. See Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926). It is well established, however, that Congress can regulate even private land use for environmental and wildlife conservation. Courts have consistently upheld Congress's authority to regulate private activities in

24

order to conserve species and protect the environment. For example, in a post-Lopez challenge to CERCLA, the Eleventh Circuit held that the private, on-site, intrastate disposal of hazardous waste was within Congress's authority to regulate because such disposal "significantly impacts interstate commerce." United States v. Olin Corp., 107 F.3d 1506, 1510 (11th Cir. 1997). In Sweet Home, the Supreme Court upheld a FWS regulation defining "harm" in the Endangered Species Act to include "significant habitat modification." 515 U.S. at 697. The regulation applied equally to private and public land. See id. at 692 (challenge brought by small landowners and logging companies). Here, the FWS similarly acted within its authority in determining that conservation of the red wolf population requires prohibiting certain takings on private land surrounding the refuges. See 51 Fed. Reg. 41,790, 41,792-93 (1986).

Given the history of federal regulation over wildlife and related environmental concerns, it is hard to imagine how this anti-taking regulation trespasses impermissibly upon traditional state functions -- either control over wildlife or local land use. Lopez and Morrison properly caution that States should receive judicial protection from unconstitutional federal encroachments on state matters. Yet endangered wildlife regulation has not been an exclusive or primary state function. In this way the anti-taking regulation is distinctly unlike the GFSZA, which forbade the possession of firearms in a school zone. The Supreme Court explained that the regulation of school zones was within the "general police power" retained by the states. See Lopez, 514 U.S. at 567. The regulation of red wolf taking is also unlike the VAWA, which established a "right to be free from crimes of violence motivated by gender," 42 U.S.C. § 13981(b) (1994). The Supreme Court found that the VAWA impeded on family law and criminal matters of traditional state concern. See Morrison, 2000 WL 574361, at *11. The Court noted, "[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." Id. at *11. Unlike the GFSZA and the VAWA, § 17.84(c) does not invade traditional state concerns -- it is simply one small part of an ongoing federal effort to preserve the scarcest natural resources for future generations.

In contrast to gender-motivated violence or guns in school yards, the conservation of scarce natural resources is an appropriate and

25

well-recognized area of federal regulation. The federal government has been involved in a variety of conservation efforts since the beginning of this century. In 1900, Congress passed the Lacey Act, which provided penalties for the taking of wildlife in violation of state laws. See Act of May 25, 1900, ch. 553, 31 Stat. 187 (codified as amended 16 U.S.C. § 701 (1994)). The Migratory Bird Treaty Act of 1918 forbade all takings of numerous bird species and explicitly preempted state laws. See 16 U.S.C. §§ 703-12. Furthermore, Congress has regulated wildlife on nonfederal property through numerous statutes, including the Bald Eagle Protection Act of 1940, which prohibits, inter alia, the taking, possession, selling, or exporting of bald eagles or any of their parts. See 16 U.S.C. §§ 668-668d (1994). Similarly, the Marine Mammal Protection Act of 1972 regulates the taking of marine mammals and restricts the importing of marine mammals and their products through an elaborate system of permits. See 16 U.S.C. §§ 1361-1421h (1994 & Supp. III 1997). The Magnuson Fishery Conservation and Management Act of 1976 provides national standards for fishery conservation and management along with an elaborate system of enforcement. See 16 U.S.C. §§ 1801-83 (1994 & Supp. III 1997).

The Supreme Court has repeatedly upheld these statutes and the conservation efforts of Congress with regard to a variety of animal species. In Missouri v. Holland, the Court upheld the Migratory Bird Treaty Act as a necessary and proper means of executing Congress's treaty power. The conservation of endangered wildlife, Justice Holmes stated, was a "matter[ ] of the sharpest exigency for national well being." 252 U.S. 416, 432-33 (1920). In 1977, the Supreme Court held that Congress had the power under the Commerce Clause to grant federal fishing licenses for use in state waters, thereby preempting conflicting state laws. See Douglas v. Seacoast Products, Inc., 431 U.S. 265 (1977). Later in Andrus v. Allard, the Court emphasized that the "assumption that the national commerce power does not reach migratory wildlife is clearly flawed." 444 U.S. 51, 63 n.19 (1979).

Post-Lopez cases addressing wildlife conservation statutes do not call these cases into question, but rather uphold the exercise of agency power over private land use in order to conserve endangered species. In Sweet Home, for example, the Court upheld the Service's broad

definition of "harm" in the ESA as including "significant habitat modification." 515 U.S. at 708. The lower courts have followed suit, both before and after Lopez. For example, in United States v. Hartsell, this court reaffirmed that Congress retains authority to regulate even non-navigable waters under the Commerce Clause. 127 F.3d 343, 348 & n.1 (4th Cir. 1997). The Ninth Circuit reaffirmed that the Bald Eagle Protection Act is a valid exercise of the commerce power because Congress had a rational basis for concluding that "extinction of the eagle would have a substantial effect on interstate commerce." See Bramble, 103 F.3d at 1482. In sum, it is clear from our laws and precedent that federal regulation of endangered wildlife does not trench impermissibly upon state powers. Rather, the federal government possesses a historic interest in such regulation -- an interest that has repeatedly been recognized by the federal courts.

B.

It is important not simply to point to the historic fact of federal efforts in the area of resource conservation. Courts have respected the justifications for these federal efforts as well.

The Supreme Court has recognized that protection of natural resources may require action from Congress. This general point holds true where endangered species are concerned. Species conservation may unfortunately impose additional costs on private concerns. States may decide to forego or limit conservation efforts in order to lower these costs, and other states may be forced to follow suit in order to compete. The Supreme Court has held that Congress may take cognizance of this dynamic and arrest the "race to the bottom" in order to prevent interstate competition whose overall effect would damage the quality of the national environment. In Hodel v. Virginia Surface Mining and Reclamation Ass'n, the Court upheld provisions of the Surface Mining Control and Reclamation Act of 1977 that regulated intrastate mining activities. 452 U.S. 264 (1981). The Court deferred to a congressional finding that nationwide standards were "essential" to insuring that competition in interstate commerce among sellers of coal would not be used to undermine environmental standards. See id. at 281-82. Congress expressed concern that such competition would disable states from improving and maintaining "adequate standards on coal mining operations within their borders." Id. (internal quotation

27

marks omitted). The Court emphasized, "The prevention of this sort of destructive interstate competition is a traditional role for congressional action under the Commerce Clause." Id. at 282. In Darby, the Court upheld a prohibition of the interstate shipment of goods produced in violation of the Fair Labor Standards Act. 312 U.S. 100. The Court reasoned that "interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions." Id. at 115.

A desire for uniform standards also spurred enactment of the ESA: "[P]rotection of endangered species is not a matter that can be handled in the absence of coherent national and international policies: the results of a series of unconnected and disorganized policies and programs by various states might well be confusion compounded." See H.R. Rep. No. 93-415, at 5. If we struck down this regulation under the commerce power, we would throw into question much federal environmental legislation. This would be a portentous step, leaving many environmental harms to be dealt with through state tort law. Such a movement might well subject interstate companies to a welter of conflicting obligations. If Congress is constitutionally forbidden from even enacting uniform environmental rules, the confusion for interstate commercial enterprises might increase exponentially.

In examining the justifications for federal action in this area it is important to understand the ESA as a culmination of a long legislative process of trial and error. This font of experience is something courts lack. As we noted earlier, preliminary efforts at endangered species regulation were widely viewed as inadequate precisely because they did not control private activities. The Endangered Species Act of 1966 established a National Wildlife Refuge System and prohibited disturbing animals or habitat within the System. See Pub. L. No. 89-669, § 4, 80 Stat. 926. The Endangered Species Act of 1969 required the Secretary of the Interior to develop a list of endangered species, and prohibited the importation of these animals or any of their by-products without a permit. See Pub. L. No. 91-135, § 3(a), § 2, 83 Stat. 275. These statutes also required federal agencies to conserve species "insofar as is practicable," § 1(b), 80 Stat. at 926, and to the "extent practicable," § 3(a), 83 Stat. at 275. In response to concerns that these Acts had little impact, Congress amended the ESA in 1973 to abandon the practicability standards and to prohibit takings on pri-

28

vate land. See 16 U.S.C. § 1538. According to the General Accounting Office, in 1993 there were 781 species listed under the ESA -- over 90 percent of these species have some or all of their habitat on nonfederal lands. Nearly three-fourths of the listed species had over 60 percent of their habitat on nonfederal lands. Courts cannot simply ignore or negate congressional efforts to devise a more effective solution to a significant national problem.

C.

This regulation does not blur the boundaries between federal and state responsibility for the conservation of species. Disturbing the balance of federal and state power was a primary concern in both Lopez and Morrison. In Lopez, Justice Kennedy argued that one of the great dangers of the federal government regulating areas of traditional state concern is that "the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory." 514 U.S. at 577 (Kennedy, J., concurring). In Brzonkala this court observed that because the VAWA supplemented and interfered with state remedies, "the citizens of the States [would] not know which sovereign to hold accountable for any failure to address adequately gender-motivated crimes of violence." 169 F.3d at 842.

Section 17.84(c) is distinguishable from both the GFSZA and the VAWA because the ultimate responsibility for the red wolf lies with the federal government. The regulation outlines the responsibilities and obligations of landowners with regard to any red wolves on their property. See 50 C.F.R. § 17.84(c). The FWS has also distributed fact sheets about the wolves and held meetings with local residents to explain the regulation and the reintroduction. From the time of reintroduction until 1994, North Carolina had no law or regulation concerning the red wolf. A recently passed North Carolina law bears a title starkly at odds with the federal regulation: "An Act to Allow the Trapping and Killing of Red Wolves by Owners of Private Land." 1994 N.C. Sess. Laws Ch. 635. Unlike the GFSZA and the VAWA, § 17.84(c) does not duplicate or supplement state and local regulation. Quite to the contrary, it simply provides federal support for an endangered species. The dangers of blurring are minimal where the federal role in the protection of endangered species has traditionally been so clear.

29

Congress, however, did not simply sweep away the role of the states by enacting a national solution to the problem of red wolf conservation. The ESA and § 17.84(c) embody principles of cooperative federalism and seek to involve the states in the conservation effort. Such cooperative federalism does not blur state and federal roles. First, a species is listed as endangered or threatened only after reviewing "those efforts, if any, being made by any State . . . to protect such species." 16 U.S.C. § 1533(b)(1)(A). Second, once the species has recovered and is "delisted," management responsibility will return to the states. See id. § 1532(3) (defining "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"). States can then regulate the species for hunting and resource management as it sees fit. For instance, in Minnesota, citizens have expressed interest in hunting the grey wolf, which is expected to be delisted soon and its management returned to the state. See Feds Again Delay Wolf Management Plan: Officials Had to Do Some Rework After Legislature Failed to Pass State Plan, Star-Tribune (Minneapolis), Nov. 29, 1999, at B7 (explaining that wolf numbers were strong enough to drop federal protection, but that the Minnesota legislature failed to pass a management plan for the wolves). Indeed, there is evidence that the recovery of the red wolf could allow a renewed trade in wolf pelts. For example, in the Northwestern Territories of Canada where wolves are plentiful, a hunter can command about $300 per pelt. See Fred Langan, Hunters on Snowmobiles Cut Down Wolf Count in N.W.T., Calgary Herald, Mar. 3, 1998, at A7.

This regulation simply does not implicate any "immediate and concrete" federalism concerns by negating state contributions to species protection. Brzonkala, 169 F.3d at 840. Quite to the contrary, invalidating this regulation would deal a damaging blow to the essential place of the enumerated powers in preserving scarce resources of all sorts for the common good.

D.

Unlike the statutes in Lopez and Brzonkala, § 17.84(c) can be upheld while observing principled limitations on federal power. The regulation applies only to a single limited area-- endangered species.

30

It does not in any way grant Congress "an unlimited police power inconsistent with a Constitution of enumerated and limited federal powers." Brzonkala, 169 F.3d at 852. Nor does the regulation "obliterate the Constitution's distinction between national and local authority." Morrison, 2000 WL 574361, at *10. In Lopez, the Court rejected the "costs of crime" and "national productivity" justifications for the GFSZA, because under these theories it was "difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." 514 U.S. at 564.

But these concerns are simply not implicated by § 17.84(c). Rather, the ESA and this regulation in particular permit the exercise of federal power only to conserve those species that are "endangered" or "threatened." The Secretary must determine whether a species is endangered or threatened "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A). Only after determining that a species is endangered or threatened can Congress regulate it. The rationale for upholding § 17.84(c), and the ESA generally, is restricted to the special relationship between endangered species and interstate commerce as drawn in Part III. It is not a connection that can be drawn outside of the endangered species context to support federal regulation of just any local or intrastate object with a medical, scientific, or economic value.

The rationale for this regulation thus stops far short of conferring upon Congress a broad police power. It is instead appellants' arguments for invalidating this regulation that go too far. If the federal government cannot regulate the taking of an endangered or threatened species on private land, its conservation and preservation efforts would be limited to only federal lands. A ruling to this effect would place in peril the entire federal regulatory scheme for wildlife and natural resource conservation.

V.

Finally, we offer a brief response to the views of our dissenting brother. According to the dissent, Lopez and Morrison require us to hold that the regulation at issue exceeds Congress's commerce power.

31

We cannot accept this view. To invalidate this regulation would require courts to move abruptly from preserving traditional state roles to dismantling historic federal ones.

The dissenting opinion regrettably offers no legal basis for taking such a leap. Instead, the dissent expresses a bevy of unsupported opinions. It offers its conclusory belief that the taking of a red wolf does not constitute an economic activity. Post at 37. It announces with some confidence that trade in wolf pelts will never revive. Post at 39. And it dismisses the available studies on the red wolf's ecological and commercial value without offering the slightest bit of evidence to contradict them. Post at 36-37. Where exactly the dissent derives its view of the inconsequential status of this species is a mystery to us. But it cannot be that the mere expression of judicial derision for the efforts of the democratic branches is enough to discard them.

There should be no doubt about the implications of the dissenting opinion. Our dissenting colleague would rework the relationship between the judiciary and its coordinate branches. It is apparent that the dissent regards § 17.84(c) as ill-advised. That is fair enough, but a judge's view of the wisdom of enacted policies affords no warrant for declaring them unconstitutional. See TVA v. Hill, 437 U.S. at 195 ("[I]n our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with `common sense and the public weal.' Our Constitution vests such responsibilities in the political branches."). In recognition of the fact that the wisdom of legislation is different from its constitutionality, courts have always started with a presumption in favor of an enactment's constitutionality. Lopez and Morrison have not shifted this presumption. In fact, they have carefully maintained it. See Morrison, 2000 WL 574361, at *6 ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."); Lopez, 514 U.S. at 568. Our dissenting brother proceeds on the quite contrary premise that the burden now rests with those who wish to uphold legislation. We know of no other way to interpret the dissent's view that the empirical underpinnings of this regulation are inadequate.

32

Reversing the presumption in favor of constitutionality plunges our dissenting brother into the thick of political controversy. As the arguments and briefs in this case attest, the matter in question involves a rather traditional struggle between property owners on the one hand and environmentalists on the other. Both sides in this political stand-off have their legitimate points to make. Property owners understandably seek more freedom to take wolves on their property. Those opposing them seek to impress the fact that even private property has historically been imbued with public responsibilities. Why the judicial branch should place its thumb on either side of this old political scale is simply beyond our comprehension. Both concern for property rights and concern for the environment play important roles in shaping political decisions. But neither can automatically be allowed to grind the nation's commerce power to a constitutional halt. An indiscriminate willingness to constitutionalize recurrent political controversies will weaken democratic authority and spell no end of trouble for the courts.

This danger is made more acute by the failure of the dissent to adopt any limiting principle for its approach. The dissent dismisses the regulation at issue as implicating nothing more than "a handful of animals, if even that, in one small region of one state." Post at 39. It declares that because there are only 41 wolves on private land, "the killing of even all 41 of the estimated red wolves" cannot have a substantial effect on interstate commerce. Post at 37. Far from being a limiting approach, the dissent's formulation is one of unprecedented breadth. It holds in essence that an endangered species can have no effect on interstate commerce on account of its endangered status and that scarce resources are on account of their scarcity too trivial to justify protection. The dissent further ignores the fact that the scarcest of natural resources, be they wildlife or mineral, will often be found in one limited locality. For the federal courts to constitutionally disable the federal government from acting in the face of scarcity is to deal a severe blow to national strength.

Sapping the national ability to safeguard natural resources is not a course supported by precedent. After Lopez, the Supreme Court upheld a broad interpretation of the Endangered Species Act, see Sweet Home, 515 U.S. 687. And in Morrison the Supreme Court cited Wickard v. Filburn and Heart of Atlanta Motel for the proposition that

33

the authority of the national government to regulate intrastate economic activity in proper circumstances had not been dismembered. 2000 WL 574361, at *7. Yet in the truncated legal universe of the dissent, the national interest in the development of natural resources counts for naught, and these cases and propositions have little, if any, role to play.

Finally, the dissenting opinion works a rent in the fabric of Our Federalism. Striking down this regulation will turn federalism on its head. Lopez and Morrison rightly emphasized the fact that the federal involvement with local school zones and the creation of civil causes of action to prevent gender-motivated violence encroached on what are traditional state functions. By contrast, the preservation of endangered species is historically a federal function. Lopez and Morrison recognized the importance of judicial review under the Commerce Clause. But, unlike the dissent, those cases set boundaries to that review and did not transform the reviewing function from a shield protecting state activities into a sword dismembering a long recognized federal one. It is as threatening to federalism for courts to erode the historic national role over scarce resource conservation as it is for Congress to usurp traditional state prerogatives in such areas as education and domestic relations. Courts seeking to enforce the structural constraints of federalism must respect the balance on both sides.**5**

Of course natural resource conservation is economic and commercial. If we were to decide that this regulation lacked a substantial effect on commerce and therefore was invalid, we would open the door to standardless judicial rejection of democratic initiatives of all sorts. Courts need not side with one party or the other on the wisdom

_____

**5** Emphasizing the political nature of this particular dispute does not consign Commerce Clause adjudications to the political processes, but rather takes account of the fact that judicial review is limited by the due respect that we must have for the decisions of a coordinate branch. See Morrison, 2000 WL 574361, at *6. It is therefore both amusing and incorrect for the dissent to suggest that upholding this endangered species regulation would somehow render Lopez or Morrison an "aberration," post at 38. The dissent ignores the significant differences between those cases and the present one -- differences that we have chronicled in detail and with which the dissent has made no effort to deal.

of this endangered species regulation. We hold only as a basic maxim of judicial restraint that Congress may constitutionally address the problem of protecting endangered species in the manner undertaken herein. The political, not the judicial, process is the appropriate arena for the resolution of this particular dispute. The judgment of the district court is accordingly

AFFIRMED.

LUTTIG, Circuit Judge, dissenting:

I wrote extensively on the Supreme Court's decision in United States v. Lopez, 514 U.S. 549 (1995), and on the Commerce Clause in the wake of that decision, in Brzonkala v. Virginia Polytechnic Institute, 169 F.3d 820 (4th Cir. 1999). And the Supreme Court has now provided even further guidance for the lower courts through its decision in Brzonkala, which is ultimately styled in that court as United States v. Morrison, No. 99-5, 2000 WL 574361 (May 15, 2000). If one holds the views expressed by the Supreme Court majority in Lopez and Morrison, and by our court in Brzonkala, a belabored discussion of the implications of those decisions for the regulation at issue before us today is not necessary.

Here, the Fish and Wildlife Service has promulgated a regulation that prohibits private landowners from shooting, wounding, killing, trapping, or otherwise harming the canis rufus , or the red wolf, even when the wolves are on the private landowners' property and threatening their crops and livestock. However, in what the majority characterizes as an act of beneficence by the government to benefit the landowners, the government does allow a property owner -- even on his own property -- to kill a wolf if the wolf is about to kill the property owner himself or his family. Ante at 6. The question presented to us for decision is not "whether the national government can act to conserve scarce natural resources of value to our entire country," ante at 3, whether we should "hold as a basic maxim of judicial restraint that Congress may constitutionally address the problem of protecting endangered species," id. at 35, or whether our decision today will "work[ ] a rent in the fabric of Our Federalism," id. at 34, "turn federalism on its head," id., or "open the door to standardless judicial rejection of democratic initiatives of all sorts," id. at 34. Rather, the simple

35

(and frankly, considerably less incitant) question of law for us to decide is whether, assuming its validity under statute, this one particular Fish and Wildlife regulation exceeds Congress' power under the Commerce Clause.

As the majority recites, there are an estimated 41 red wolves resident on private property and 75 red wolves total, in eastern North Carolina. The majority sustains the Fish and Wildlife's regulation unhesitatingly on the ground that the taking of the 41 red wolves that might occur as property owners attempt to protect themselves and their families, their property, their crops, and their livestock from these wolves, will have a "substantial effect" on interstate commerce. This substantial effect on interstate commerce comprises, according to the majority, four separate effects on such commerce, each of which the majority views as "substantial."

First, the majority concludes, in exclusive reliance upon a Cornell University professor's unpublished study entitled "Red Wolf Recovery in Northeastern North Carolina and the Great Smoky Mountains National Park," that "[m]any tourists travel to North Carolina from throughout the country for `howling events' -- evenings of listening to wolf howls accompanied by educational programs," id. at 14-15, and thus that the taking of these wolves will have a substantial effect on the interstate commercial industry of tourism.

Second, the majority concludes, largely in reliance, not upon their substantive conclusions, but rather upon the fact of the generation of two articles -- "The Red Wolf as a Model for Carnivore Reintroductions," which was published in the Symposium of the Zoological Society of London, and the 1994 unpublished study "Alligator River National Wildlife Refuge Red Wolf (Canis Rufus) Scat Analysis" -- that the taking of these red wolves will have a substantial effect on the "interstate market" of "scientific research." Ante at 16.

Third, the majority concludes, largely on the strength of an article that appears in the University of Pennsylvania Journal of International Economic Law, that the taking of these wolves will have a substantial effect on the majority-anticipated resurrection of an interstate trade in fur pelts. Ante at 17. In reliance upon an article that appeared two years ago in the Calgary Herald entitled "Hunters on Snowmobiles

36

Cut Down Wolf Count in N.W.T.," the majority observes that "[f]or example, in the Northwestern Territories of Canada where wolves are plentiful, a hunter can command about $300 per pelt." Ante at 30. The majority frankly acknowledges that there has not been a trade in wolf pelts since the 1800s, ante at 17, but, to the majority, "this temporal difference is beside the point." Id.

Finally, in reliance upon yet another unpublished study by Robert Esher and Theodore Simons entitled "Red Wolf Propagation on Horn Island, Mississippi: Red Wolf Ecological Studies," and by analogy to the finding therein of "increased shore bird nesting, likely due to the reduction in raccoon predation," ante at 18, the majority concludes that the red wolves which the farmers and landowners have heretofore thought threatened their families, their crops, and their livestock, actually help the farmers, by killing the animals that destroy the farmers' crops, and thereby substantially affect interstate commerce. Ante at 17-18.

That these conclusions are not even arguably sustainable under Lopez, Morrison, and Brzonkala, much less for the reasons cobbled together by the majority, is evident from the mere recitation of the conclusions. The killing of even all 41 of the estimated red wolves that live on private property in North Carolina would not constitute an economic activity of the kind held by the Court in Lopez and in Morrison to be of central concern to the Commerce Clause, if it could be said to constitute an economic activity at all. Morrison, 2000 WL 574361, at *8 ("[A] fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case."). It is for this reason that the majority's attempted aggregation is impermissible: "While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." 2000 WL 574361, at *9 (citations omitted). But even assuming that such is an economic activity, it certainly is not an activity that has a substantial effect on interstate commerce. The number of inferences (not even to mention the amount of speculation) necessary to discern in this activity a substantial effect on interstate commerce is exponentially greater than the number necessary in Lopez to show a substantial effect on interstate

37

commerce from the sale of guns near schools or in Morrison to show a substantial effect on interstate commerce from domestic assault. The number (and the speculation) is even greater than that necessary in Wickard v. Filburn, 317 U.S. 111 (1942). And, it bears reminding, the regulated activity in Lopez and Wickard at least was in some sense economic in character.

In a word, the expansive view of the Commerce power expressed by the majority today is closely akin to that separately expressed by Justice Breyer in his dissent in Lopez and Justice Souter in his dissent in Morrison, and certainly more closely akin to those dissenting Justices' views than it is to the view of the Lopez majority in Lopez and Morrison. Indeed, all in all, it is a view far more expansive than that expressed by any of the dissenting Justices in either Lopez or Morrison -- a fact confirmed by the dissents in Morrison, ironically the case for which the majority herein unnecessarily held this case in abeyance. See Order of April 21, 2000 (Luttig, J., dissenting from abeyance order). It goes without saying that it is much more like that of the dissent in Brzonkala than that of the majority in our court. See Brzonkala v. Virginia Polytechnic Institute , 169 F.3d 820, 905 (Motz, J., dissenting).

Indeed, if the Supreme Court were to render tomorrow the identical opinion that the majority does today (not necessarily the decision, but the opinion, worded capaciously as it is), both Lopez and Morrison would be consigned to aberration. And, by deciding this case as it does, and on the particular reasoning that it does, the majority would have all but consigned to aberration our own decision in Brzonkala were it not for the Supreme Court's recent affirmance of that decision.

I would invalidate this particular agency regulation under Lopez, Morrison, and Brzonkala, and instead recognize as the aberration that action of invalidation, rather than the opinions in Lopez, Morrison, and Brzonkala, as does the majority. Compare Morrison, 2000 WL 574361, at *30 (Souter, J., dissenting) (similarly to majority, characterizing Lopez and Morrison, and by implication Brzonkala, as aberrational vis-a-vis the sixty years of jurisprudence predating Lopez and predicting that Lopez and Morrison will not be "enduring law"); see also Morrison, 2000 WL 574361, at *35 (Breyer, J., dissenting) ("And even were I to accept Lopez as an accurate statement of the

38

law, which I do not . . . ."). I would do so without any fear whatsoever that such "would place in peril the entire federal regulatory scheme for wildlife and natural resource conservation," ante at 31, as the majority over-rhetorically predicts would result from the invalidation of this lone regulation. No more so than in Brzonkala will "[m]aintaining the integrity of the enumerated powers" by invalidating this single regulation "mean that statutes will topple like falling dominos." Brzonkala, 169 F.3d at 897 (Wilkinson, J., concurring).

While it could be lost in a reading of the majority opinion, we do not address here Congress' power over either the channels or instrumentalities of interstate commerce. We do not address activity that is interstate in character. We do not address in this case a statute or a regulation with an express interstate commerce jurisdictional requirement, which would all but ensure constitutional validity. We do not have before us an activity that has obvious economic character and impact, such as is typically the case with non-wildlife natural resources, and even with other wildlife resources. We are not even presented with an activity as to which a plausible case of future economic character and impact can be made.

To the contrary, we are confronted here with an administrative agency regulation of an activity that implicates but a handful of animals, if even that, in one small region of one state. An activity that not only has no current economic character, but one that concededly has had no economic character for well over a century now. An activity that has no foreseeable economic character at all, except upon the baldest (though admittedly most humorous) of speculation that the red wolf pelt trade will once again emerge as a centerpiece of our Nation's economy. And, importantly, an activity that Congress could plainly regulate under its spending power and under its power over federal lands, regardless.

Judge Wilkinson, for his part, has written that he regards Lopez, Brzonkala, and presumably now Morrison, as examples in a "spate of decisions" of "contemporary judicial activism," Brzonkala, 169 F.3d 820, 892-93 (Wilkinson, J., concurring), as he similarly regards the Supreme Court's decisions in Printz v. United States, 521 U.S. 98 (1997); City of Boerne v. Flores, 521 U.S. 507 (1997); Seminole Tribe v. Florida, 517 U.S. 44 (1996); and New York v. United States,

39

505 U.S. 144 (1992). See id. The dissenting Justices in both Lopez and Morrison similarly regard these decisions. See, e.g., Morrison, 2000 WL 574361, at *17 (Souter, J., dissenting); see also Morrison, 2000 WL 574361, at *30 (Breyer, J., dissenting). But I do not regard these decisions as such, and I certainly do not understand the majority of the Supreme Court to so regard these decisions.

Nor, in the wake of Lopez and Morrison , can I accept my colleagues' view of the appropriate role of the judiciary in Commerce Clause disputes. As Judge Wilkinson's view of Lopez mirrors that of the dissenters in Lopez and Morrison, so also does my colleagues' view of the judiciary's role in Commerce Clause conflicts mirror that of the Lopez and Morrison dissenters. The majority herein, like the dissents in both Lopez and Morrison, takes the view that the political processes are the safeguard against federal encroachment upon the states. Thus, the majority concludes its opinion: "The political, not the judicial, process is the appropriate arena for the resolution of this particular dispute." See ante at 35. Accord Morrison, 2000 WL 574361 at *26 (Souter, J., dissenting) ("The defect, in essence, is the majority's rejection of the Founders' considered judgment that politics, not judicial review, should mediate between state and national interests . . . ."); id. at *27 ("As with `conflicts of economic interest,' so with supposed conflicts of sovereign political interests implicated by the Commerce Clause: the Constitution remits them to politics."); id. (Breyer, J., dissenting) (citing Souter, J., dissenting, in Morrison; Stevens, J., dissenting, in Kimel v. Florida Bd. of Regents, 528 U.S. ___ (2000); and Blackmun, J., for the court, in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528 (1985)).

The majority of the Supreme Court in Lopez and Morrison has left no doubt, however, that the interpretation of this clause of the Constitution, no less so than any other, must ultimately rest not with the political branches, but with the judiciary. See Lopez, 514 U.S. 549, 557 n.2 ("[W]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.") (quoting Heart of Atlanta Motel v. United States, 379 U.S. 241, 273 (1964) (Black, J., concurring)); Morrison, 2000 WL 574361, at *10 n.7 ("Departing from their parliamentary past, the Framers adopted a written Constitu-

40

tion that further divided authority at the federal level so that the Constitution's provisions would not be defined solely by the political branches nor the scope of legislative power limited only by public opinion and the legislature's self-restraint. <u>See</u>, <u>e.g.</u>, <u>Marbury</u> v. <u>Madison</u>, 1 Cranch 137, 176 (1803) (Marshall, C.J.).").

Accordingly, I would faithfully apply in this case the Supreme Court's landmark decisions in <u>Lopez</u> and <u>Morrison</u>, as I would in any other case. The affirmative reach and the negative limits of the Commerce Clause do not wax and wane depending upon the subject matter of the particular legislation under challenge.

41